**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 15-2157

MONTE HOOPER, on behalf of himself and all others similarly situated,

Plaintiff – Appellant,

v.

UNITEDHEALTHCARE INSURANCE COMPANY; THE MICHELIN MEDICAL CARE AND PRESCRIPTION DRUG PLAN; THE MICHELIN PENSION AND BENEFITS BOARD,

Defendants – Appellees,

and

UNITEDHEALTH GROUP, INCORPORATED; MICHELIN NORTH AMERICA, INCORPORATED,

Defendants.

Appeal from the United States District Court for the District of South Carolina, at Greenville. Bruce H. Hendricks, District Judge. (6:12-cv-01519-BHH)

Argued: March 23, 2017                                Decided: June 13, 2017

Before TRAXLER, DIAZ, and FLOYD, Circuit Judges.

Affirmed by unpublished opinion. Judge Traxler wrote the opinion, in which Judge Diaz and Judge Floyd joined.

**ARGUED:** William Mitchell Hogan, GILREATH LAW FIRM, Greenville, South Carolina, for Appellant. Vance Earle Drawdy, OGLETREE, DEAKINS, NASH, SMOAK & STEWART P.C., Greenville, South Carolina; Donald T. Campbell, STINSON LEONARD STREET LLP, Minneapolis, Minnesota, for Appellees. **ON BRIEF:** James R. Gilreath, GILREATH LAW FIRM, Greenville, South Carolina; Cheryl F. Perkins, Charles W. Whetstone, Jr., WHETSTONE, PERKINS & FULDA, LLC, Columbia, South Carolina, for Appellant. Mark W. Bakker, WYCHE, P.A., Greenville, South Carolina; Brian W. Thomson, STINSON LEONARD STREET LLP, Minneapolis, Minnesota, for Appellee UnitedHealthcare Insurance Company.

─────────────

Unpublished opinions are not binding precedent in this circuit.

TRAXLER, Circuit Judge:

Plaintiff Monte Hooper brought this action against the Michelin Medical Care and Prescription Drug Plan, the Michelin Pension and Benefits Board, and UnitedHealthcare Insurance Company, under the Employee Retirement Income Security Act, 29 U.S.C. § 1001 *et seq.,* ("ERISA"), seeking additional reimbursement for a series of steroid knee injections that an orthopedic surgeon administered to his spouse. The district court granted summary judgment to the defendants. We affirm.

I.

Michelin North America, Inc., is engaged in the business of manufacturing and selling tires throughout North America. The Michelin Medical Care and Prescription Drug Plan (the "Plan") was established by Michelin under ERISA to provide coverage for medical expenses incurred by Michelin employees and their dependents. The Plan is self-funded by Michelin. The Michelin Pension and Benefits Board (the "Board") is the plan administrator, delegated the "authority to interpret plan provisions at its discretion, including eligibility for benefits." J.A. 311.

The Plan operates pursuant to a Summary Plan Description ("SPD") that functions as both the Plan document and its summary description. The SPD informs plan participants that "[t]he benefit programs are governed by official plan documents." J.A. 41. Its stated "intent . . . is to summarize the plans in a manner to be understood by the average plan participant" and "[t]echnical terms are defined in the *Key Terms* section" of the Plan. J.A. 41. However, plan participants are encouraged to contact the Michelin

3

Personnel Service Center "[i]f, after reading th[e] SPD," they "have questions or need more information about the benefit programs." J.A. 41.

UnitedHealthcare Insurance Company ("UHC") provides claims processing services for the Plan. It provides no health insurance coverage and pays no benefits out of its own funds. UHC makes the initial benefits determination for Michelin and handles first-level appeals. Plan participants may file a second-level appeal to the Michelin Appeals Board (the "Appeals Board"), which has been delegated the "sole discretionary authority to determine benefit eligibility and to construe plan provisions for all Michelin benefit plans." J.A. 47. The Appeals Board gives "[n]o deference . . . to the original decision [by UHC] to deny the benefit," and its decision is the final one for purposes of review under ERISA. J.A. 326.

Hooper is an employee of Michelin. He elected coverage for himself and his wife, Joan Hooper, under the Plan's "Network-Only" option.[1] J.A. 92. Pertinent to this appeal, the Network-Only Plan provides for payment of "Physician Expenses" for "Office Visits" at 100% of the eligible expenses, subject to a $35 copay per visit for "Family Practice, General Practice, Internal Medicine, Obstetrics and/or OB/GYN, [and] Pediatrics," and to a $65 copay per visit for "Other Specialists." J.A. 92. Expenses for a "Surgeon" performing "Outpatient Surgery," which includes "office surgery," are paid at 80% of the eligible expenses. J.A. 93.

---

[1] The Network-Only option generally provides medical reimbursement only when a participant receives medical care from an in-network provider for UHC. Eligible expenses for in-network benefits are based upon contracted rates.

4

On September 13, 2010, Mrs. Hooper visited Dr. Kyle Cassas, an in-network orthopedic surgeon for treatment of her bilateral knee pain. Dr. Cassas performed a series of therapeutic steroid injections to treat Mrs. Hooper. Dr. Cassas billed UHC for his services utilizing the Current Procedural Terminology ("CPT") codes from the 2010 CPT codebook. The CPT codebook, which is published by the American Medical Association, contains a uniform "set of codes, descriptions, and guidelines intended to describe procedures and services performed by physicians and other health care providers." J.A. 791. The codebook is divided into six sections, each with "subsections with anatomic, procedural, condition, or descriptor subheadings." J.A. 791. "Each procedure or service is identified with a five-digit code," which "simplifies the reporting of services." J.A. 791.

Dr. Cassas selected CPT codes 99214 and 99051 for Mrs. Hooper's office visit, both of which are contained within the "Evaluation and Management" section of the CPT codebook. J.A. 791. Dr. Cassas selected CPT codes 20550 and 20610 for the steroid knee injections, both of which are contained within the "Surgery/Musculoskeletal System" section of the CPT codebook. J.A. 809, 810. CPT code 20550 applies to the following procedures: "Injection(s); single tendon sheath, or ligament, aponeurosis (eg, plantar 'fascia')." J.A. 809. CPT code 20610 applies to the following procedures: "Arthrocentesis, aspiration and/or injection; . . . major joint or bursa (eg, shoulder, hip, knee joint, subacromial bursa)." J.A. 810. The parties agree that the CPT codes selected by Dr. Cassas were the correct ones for the procedures performed.

5

Based upon the CPT codes submitted by Dr. Cassas, UHC paid 100% of the eligible expenses associated with Mrs. Hooper's office visit and 80% of the charges associated with the steroid injections. A prescription drug injection administered during the office visit (coded as J0702) was paid at 100% of the allowable charges. For the office visit, Hooper was responsible for the $65 copay only. For the steroid knee injections, the total eligible expenses were $302.46, leaving Hooper responsible for the 20% coinsurance balance of $60.49. Hooper received notification of UHC's decision via an Explanation of Benefits form.

On October 6, 2010, Hooper filed a first-level appeal to UHC stating only that: "This is a letter of appeal from charges 9-13-2010 Dr. K. Cassas office visit for an injection for knee pain on my wife Joan K. Hooper. Please review Patient Pays part on this claim, patient responsibility is incorrect." J.A. 525. By letter dated October 13, 2010, UHC advised Mrs. Hooper that it "want[s] to make decisions about our customers' requests based on complete information," and provided a fax number and address for Mrs. Hooper to send "any information that might help . . . [UHC] in [its] review of [her] request." J.A. 526. The Hoopers provided no further basis or information in support of the first-level appeal. On November 3, 2010, UHC upheld its initial decision: "[A]ccording to your Summary Plan Description, under the 'Schedule of Benefits – Network-Only Plan' section, 'Surgeon/Anesthesiologist (includes office surgery)' subsection, this request for payment was processed correctly," J.A. 528. "[S]urgical procedures were reimbursed at 80% of eligible expenses and office visit charges were reimbursed at 100% of eligible expenses after copay." J.A. 528.

6

On November 9, 2010, Hooper filed a second-level appeal to the Michelin Appeals Board, again stating only that: "This is a 2nd letter of appeal from charges 9-13-2010 Dr. K. Cassas office visit for an injection for knee pain on my wife Joan K. Hooper. Please review Patient Pays part on this claim, patient responsibility is incorrect." J.A. 567. On December 2, 2010, the Appeals Coordinator forwarded copies of the pertinent portions of the Plan to Mrs. Hooper and advised her that the claim was paid according to the Plan: 100% minus the $65 copay for the office visit and 80% reimbursement for the surgeon's expenses associated with the office surgery. Mrs. Hooper was advised that the Appeals Board would review the claim at its December meeting and that she had the right to appear personally or through a representative, to "review pertinent documents," to "submit issues and arguments in writing," and to "present any additional information" that supported her position and her claimed entitlement to the benefit sought. J.A. 569. The Appeals Coordinator also contacted UHC and obtained the CPT and diagnosis codes for the surgeries, verifying that the procedures involved the four steroid injections for which UHC was billed by Dr. Cassas.

At Hooper's request, the Appeals Board postponed review of the claim until its January 17, 2011 meeting. Mrs. Hooper was again asked to contact the Appeals Coordinator as soon as possible if she had any additional information to submit in support of her appeal. Mrs. Hooper provided no information. By letter dated January 17, 2011, Hooper informed the Appeals Board that his wife had visited the Steadman Hawkins Clinic in September 2010 "for a series of injections in her knee that were administered in an office visit [by] the provider. The injections were class[ified] as surgery, which

7

resulted in co-pay charge, and a coinsurance charge for each injection." J.A. 576. Hooper did not appear to specifically challenge whether the steroid injections should have been classified as "surgery" under the Plan. Rather, he questioned why he was financially responsible for the co-pay charge for the office visit ($65) *and* the 20% coinsurance charge for the series of steroid injections administered during the office visit ($60.49). This letter was the only additional documentation or information submitted to the Appeals Board during the second-level appeal. The Hoopers did not attend the Appeals Board meeting in person, by representative, or by telephone.[2]

On January 24, 2011, the Appeals Board notified Hooper that his appeal for additional medical insurance coverage for Mrs. Hooper's claim was denied. More specifically, the Appeals Board advised Hooper as follows: "Based on the Summary Plan Description, under the Schedule of Benefits for Network-Only Plan the patient pays $65.00 copay for the specialist visit *and* 80% of eligible expenses. The patient responsibility is correct per the Board's review." J.A. 553 (emphasis added).

Having exhausted his administrative remedies, Hooper filed this putative class action in the district court under 29 U.S.C. § 1132(a)(1)(B) against the Plan, the Board, and UHC, alleging that the Michelin Appeals Board abused its discretion in upholding UHC's determination that Mrs. Hooper's steroid knee injections were payable at 80% of the eligible expenses. In support, Hooper relied upon three items of evidence that he

---

[2] As noted in the Appeals Coordinator's correspondence to Mrs. Hooper, the responses were directed to her due to privacy laws. Mrs. Hooper was also advised that she could sign an enclosed authorization form if she preferred that the Appeals Board respond to her husband.

8

failed to present to either UHC or the Michelin Appeals Board during the first- and second-level appeals. The district court refused to consider the additional evidence and found that the Michelin Appeals Board had not abused its discretion in denying Hooper's claim for additional reimbursement. Accordingly, the district court granted summary judgment to the defendants. This appeal followed.

## II.

"In an appeal under ERISA, we review a district court's decision de novo, employing the same standards governing the district court's review of the plan administrator's decision." *Johnson v. Am. United Life Ins. Co.*, 716 F.3d 813, 819 (4th Cir. 2013) (internal quotation marks omitted). When, as here, an ERISA Plan confers discretion on the plan administrator to determine eligibility and to construe the terms of the plan, we review the benefit denial for an abuse of discretion only. *See Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989); *Johnson*, 716 F.3d at 819.

Under the abuse of discretion standard, "the administrator or fiduciary's decision will not be disturbed if it is reasonable, even if this court would have come to a different conclusion independently." *United McGill Corp. v. Stinnett*, 154 F.3d 168, 170–71 (4th Cir. 1998) (internal quotation marks omitted). "[A]n administrator's decision is reasonable if it is the result of a deliberate, principled reasoning process and if it is supported by substantial evidence." *Evans v. Eaton Corp. Long Term Disability Plan*, 514 F.3d 315, 322 (4th Cir. 2008) (internal quotation marks omitted). Generally, we consider eight nonexclusive factors when reviewing the plan administrator's decision for reasonableness:

9

(1) the language of the plan; (2) the purposes and goals of the plan; (3) the adequacy of the materials considered to make the decision and the degree to which they support it; (4) whether the fiduciary's interpretation was consistent with other provisions in the plan and with earlier interpretations of the plan; (5) whether the decisionmaking process was reasoned and principled; (6) whether the decision was consistent with the procedural and substantive requirements of ERISA; (7) any external standard relevant to the exercise of discretion; and (8) the fiduciary's motives and any conflict of interest it may have.

*Booth v. Wal–Mart Stores, Inc. Assocs. Health & Welfare Plan*, 201 F.3d 335, 342-43 (4th Cir. 2000).

"Generally, consideration of evidence outside the administrative record is inappropriate when a coverage determination is reviewed for abuse of discretion." *Helton v. AT&T Inc.*, 709 F.3d 343, 352 (4th Cir. 2013) (citing *Sheppard & Enoch Pratt Hosp. v. Travelers Ins. Co.*, 32 F.3d 120, 125 (4th Cir. 1994)). "The rationale for this rule is that, to the extent possible, the administration of ERISA plans should be left to plan fiduciaries, not federal courts." *Id.* In addition, "promoting internal resolution of claims furthers ERISA's goals of expeditiously, efficiently, and inexpensively resolving coverage disputes." *Id.* We have recognized only a limited exception to this rule. "[A] district court may consider evidence outside of the administrative record on abuse of discretion review in an ERISA case when [1] such evidence is necessary to adequately assess the *Booth* factors and [2] the evidence was known to the plan administrator when it rendered its benefits determination." *Id.* at 356.

III.

Under the terms of the "Network-Only Plan," Michelin is obliged to pay surgeon expenses associated with outpatient surgery, including "office surgery," at 80% of the

10

eligible expenses. Michelin is obliged to pay physician expenses for office visits with an orthopedic surgeon at 100% of eligible expenses, after payment of the $65 copay. Thus, if a surgical procedure is performed in an office setting, the patient is responsible for both the $65 copay and the 20% coinsurance charge for the surgical procedure. In comparison, if the procedure is performed in an outpatient surgical facility, Michelin will pay the facility expense at 100% with a $200 copay, and 80% for the procedure. J.A. 93. Either way, the patient must pay separately for the location of the procedure and for the procedure itself. UHC and the Michelin Appeals Board correctly advised Hooper of this dual responsibility. However, the terms "office visit," "outpatient surgery," and "office surgery" are not defined in the Plan.

Based upon the CPT codes selected and submitted for payment by Dr. Cassas, which classify steroid injections as a surgical procedure, UHC paid 100% of the charges associated with the office visit (minus the $65 copay) and 80% of the charges associated with the musculoskeletal steroid injections. Hooper challenged that determination, but provided no basis for his challenge and no evidence in support of it. Consequently, UHC upheld its determination. Hooper then lodged his second-level appeal with the Michelin Appeals Board, again providing nothing in the way of argument or evidence. Rather, Hooper only specifically questioned UHC's determination that he was properly being held responsible for the $65 copay for the office visit *and* the 20% coinsurance for the surgeon expenses associated with the office surgery.

On appeal, Hooper does not challenge the administrative determination that a plan participant who has "office surgery" performed by an orthopedic surgeon is properly held

11

responsible for both the $65 charge for the office visit and the 20% coinsurance charge for the surgical procedure. Rather, he argues that the Michelin Appeals Board (hereinafter "Michelin") abused its discretion when it upheld UHC's determination that steroid knee injections are surgical procedures for purposes of the Plan based upon the CPT codes. We find no abuse of discretion in Michelin's decision.

## A.

We begin with Hooper's claim that Michelin abused its discretion by relying on the CPT codebook when it interpreted the Plan terms and rendered its final benefits determination. Setting aside for the moment that Hooper did not lodge such a specific challenge to UHC or Michelin when he had the opportunity to do so, we see nothing unreasonable or unprincipled in Michelin's decision to rely upon the CPT codebook and its designations.

The CPT codebook first appeared in 1966. Updated and published annually by the American Medical Association, it contains the uniform "set of codes, descriptions, and guidelines intended to describe procedures and services performed by physicians and other health care providers" utilized by medical providers and the insurance industry. J.A. 791; *see Practice Mgmt. Info. Corp. v. Am. Med. Ass'n*, 121 F.3d 516, 517 (9th Cir. 1997) (noting that the CPT is revised "each year to reflect new developments in medical procedures"), *amended by* 133 F.3d 1140 (9th Cir. 1998). The 2010 version of the CPT codebook, in effect when Dr. Cassas billed UHC for Mrs. Hooper's procedures, best describes its development and use as of that time:

12

*Current Procedural Terminology* . . . is a listing of descriptive terms and identifying codes for reporting medical services and procedures performed by physicians. The purpose of the terminology is to provide a uniform language that will accurately describe medical, surgical, and diagnostic services, and will thereby provide an effective means for reliable nationwide communication among physicians, patients, and third parties. . . .

CPT descriptive terms and identifying codes currently serve a wide variety of important functions in the field of medical nomenclature. The CPT codebook is useful for administrative management purposes such as claims processing and for the development of guidelines for medical care review. The uniform language is also applicable to medical education and outcomes, health services, and quality research by providing a useful basis for local, regional, and national utilization comparisons. The CPT codebook is the most widely accepted nomenclature for the reporting of physician procedures and services under government and private health insurance programs. In 2000, the CPT code set was designated by the Department of Health and Human Services as the national coding standard for physician and other health care professional services and procedures under the Health Insurance Portability and Accountability Act (HIPAA). This means that for all financial and administrative health care transactions sent electronically, the CPT code set will need to be used.

J.A. 790; *see also Newport News Shipbuilding & Dry Dock Co. v. Loxley*, 934 F.2d 511, 513 n.2 (4th Cir. 1991) (noting that the CPT "coding system is the most widely accepted nomenclature for the reporting of physician procedures and services under government and private health insurance programs") (internal quotation marks omitted); *Apple Inc. v. Psystar Corp.*, 658 F.3d 1150, 1158 (9th Cir. 2011) (noting that "the CPT had become an industry standard" by 1997).

Relevant to Michelin's decision is the section/subsection of the CPT codebook entitled "Surgery/Musculoskeletal System" J.A. 809-10. Hooper concedes that the codes selected by Dr. Cassas for the steroid knee injections are contained within this subsection

and that they correctly and accurately describe the treatment provided to Mrs. Hooper. However, Hooper contends that UHC and Michelin should not have relied upon the CPT codes to pay the medical claim because the CPT codes are not expressly incorporated into the terms of the Plan and because he believes that Michelin should have instead resorted to common definitions of the term "surgery" to make its determination. We are unpersuaded.

Although the CPT codes are referenced in the SPD, Hooper correctly observes that the Network-Only Plan provisions do not specifically inform plan participants that these codes will be used to determine whether a medical procedure or treatment falls with the "Physician Services/Office Visits" section of the Plan or the "Outpatient Surgery/office surgery" section of the Plan. Nevertheless, these terms are undefined in the Plan and, therefore, it was within the discretion of Michelin to interpret them in a reasonable manner. We see nothing in the Plan that would preclude Michelin, in the exercise of its discretion, from relying upon this well-established industry standard for procedure classification and medical billing when determining whether a particular procedure should be classified and paid as "office surgery" as opposed to as an "office visit" under the terms of the Plan.

Hooper's argument that Michelin should have resorted to more common and ordinary definitions of surgery, instead of to the CPT codebook, also fails. Although we may interpret Plan terms *de novo* when the Plan does not reserve that discretionary authority to the plan administrator, we may not do so here. *See, e.g., U.S. Airways, Inc. v. McCutchen*, 133 S. Ct. 1537, 1549 (2013); *Johnson*, 716 F.3d at 820. The question

before us is whether Michelin's interpretation of the Plan terms was unreasonable or unprincipled, not whether this court believes that a particular "common definition" or "common understanding" could or should apply. "The dispositive principle remains . . . that where plan fiduciaries have offered a reasonable interpretation of disputed provisions, courts may not replace [it] with an interpretation of their own – and therefore cannot disturb as an abuse of discretion the challenged benefits determination." *de Nobel v. Vitro Corp.*, 885 F.2d 1180, 1188 (4th Cir. 1989) (internal quotation marks omitted).

For the same reason, we cannot ignore the fact that Hooper did not make this "CPT codes verses common-definition" argument when UHC and Michelin could have reached a different "internal resolution" of his coverage dispute, even though the CPT codes were referenced in the responses to him. *Helton,* 709 F.3d at 352. He submitted no additional information to support this claim and made no claim or case that Michelin should cast aside the CPT codebook and classify the musculoskeletal steroid knee injections as an "office visit" or routine non-surgical injection, rather than as an "office surgery" procedure. There is likewise nothing in the administrative record that would have placed Michelin on notice that it needed to solicit more medical records or medical opinions after it confirmed that the codes submitted were correct, or that would have otherwise placed a burden upon it to question the provider's coding decision. *Cf. Harrison v. Wells Fargo Bank, N.A.*, 773 F.3d 15, 20 (4th Cir. 2014) (holding that the plan administrator failed to meet its Plan obligations when it "chose to remain willfully blind to readily available [medical] information" where the plan beneficiary had placed them on notice of the existence of such information).

In sum, Michelin relied upon the industry standard for "accurately describ[ing] medical, surgical, and diagnostic services," J.A. 790, and upheld classification of the steroid knee injections performed by Dr. Cassas as office surgery, based upon the Surgery/Musculoskeletal CPT codes selected by Dr. Cassas and submitted to it. That determination was a reasonable and principled one.

B.

Hooper next argues that, even if the CPT codes were a reasonable basis upon which to interpret the Plan provisions, Michelin's determination was unreasonable because it failed to take into account information about "injections" that was present on UHC's "Internet Benefits at a Glance" ("IBAAG") webpage. The cover page of the SPD contains several website addresses for various entities that assist Michelin in the administration of their ERISA plans. As the claims administrator for the medical plans, UHC's website ("MyUHC") is included. If a plan participant had visited this website and navigated to the IBAAG webpage, he would have learned that "Physician's Office Services" for "Sickness or Injury" generally includes "Injections," including "allergy injections," and that such injections are paid at "100% of eligible expenses." J.A. 708. Hooper contends that the IBAAG is a part of the Plan, and that the only reasonable interpretation of the IBAAG's reference to "Injections" would require Michelin to pay 100% of the eligible expenses for *any* type of injection -- surgical or nonsurgical, including anesthesia administered by injection. We disagree.

First, the SPD does not incorporate UHC's MyUHC website or the IBAAG portion of that website into the terms of the Plan. The SPD informs plan participants that

16

"[t]he benefit programs are governed by official plan documents." J.A. 41. The cover page provides the telephone numbers and website addresses for the various entities that assist with claims and benefits processing (including, but not limited to the medical Plan), but consistently advises plan participants to contact the "Michelin Personnel Service Center" "[f]or all questions on [all] benefits listed." J.A. 39. Accordingly, we reject Hooper's claim that the IBAAG information must be considered a part of the Plan terms.

Second, despite repeated requests from UHC and Michelin for additional information, the Hoopers did not submit the IBAAG information in support of the first-level or second-level appeal of UHC's benefits determination. Nor did they claim that Mrs. Hooper underwent the steroid injections in reliance upon the IBAAG information. But even if we were to impute knowledge of the IBAAG to Michelin at the time of its decision, we still could not say that Michelin's decision was an unreasonable or unprincipled one. Although the IBAAG does not define the term "injections," the context in which it is used indicates that it refers to routine, nonsurgical injections administered in a physician's office for sickness or injury (such as an "allergy shot"), and not to the more complex types of therapeutic steroid injections that are administered by surgeons and anesthesiologists. In addition, both the IBAAG and the SPD advise plan participants that eligible expenses for surgeons and anesthesiologists, when associated with surgical procedures performed in an office, are paid at 80%. Consequently, we cannot say that the IBAAG's reference to "injections" in the "Physician's Office Services" section is so clear and unambiguous as to render Michelin's reliance upon the CPT codes an unreasonable or unprincipled one.

C.

Finally, Hooper argues that the district court erred when it refused to consider two additional items of information that he submitted to the district court in support of his claim that Michelin abused its discretion, but which he also did not submit to UHC or Michelin during the administrative appeals process. In order to rely upon this information, Hooper must demonstrate that it is necessary to adequately assess the *Booth* factors and that it was known to Michelin at the time that it rendered its benefits determination. *See Helton*, 709 F.3d at 352. He has failed to do so.

1.

The first item of evidence involves an insurance claim that Mrs. Hooper's then-treating physician submitted to UHC for similar steroid injections in 2009. UHC initially determined that the 2009 claim was reimbursable as office surgery at 80%, but reconsidered that determination and paid the claim at 100% when the physician's office requested reassessment of the claim.

Hooper concedes that the 2009 benefits determination was a determination made *solely* by UHC and, therefore, that Michelin had no involvement in the decision. And Hooper has presented nothing to indicate that Michelin had actual knowledge of that single decision by UHC. Nevertheless, Hooper argues that the district court should have considered the 2009 claim as evidence of Michelin's alleged abuse of discretion because (1) UHC's 2009 determination was inconsistent with its 2010 determination, and (2) we should impute UHC's knowledge of the 2009 claim to Michelin. We are unpersuaded.

18

Relying on principles of agency, we have held that "an ERISA plan administrator can be charged with [1] knowledge of information acquired by its employees in the scope of their employment and [2] the contents of its books and records." *Id.* at 356. UHC is not an employee of Michelin. UHC is a third-party claims administrator that handles largely ministerial and administrative tasks on behalf of Michelin, processing initial claims requests and considering first-level appeals from those decisions. And there is nothing in the record that would indicate that UHC's single 2009 benefits determination was within the books and records of Michelin. Thus, even if we were to assume that UHC's 2009 determination is inconsistent with its 2010 determination, the 2009 claim does not demonstrate that Michelin's "interpretation [of the Plan terms] was [in]consistent . . . with [its] earlier interpretations of the plan," *Booth*, 201 F.3d at 342, nor was the information known to Michelin at the time it made its decision, *see Helton*, 709 F.3d at 356.[3]

Moreover, even if we were to impute knowledge of UHC's handling of the 2009 claim to Michelin at the time of its 2010 decision, we could not say that Michelin abused its discretion when it interpreted and applied the Plan terms in 2010. Inconsistency on the part of Michelin would be only one of many considerations in *Booth*'s eight-factor test for abuse of discretion, but not a dispositive one. The fact remains that Michelin, as the plan administrator, is vested with the sole discretionary authority to interpret the Plan, and it did not consider or issue any decision in connection with the 2009 claim. Thus,

---

[3] Hooper conceded in his brief and oral argument that UHC is not a plan administrator or fiduciary for purposes of ERISA.

even if we were to impute knowledge of the 2009 claim to Michelin, its discretionary decision to adhere to the CPT codebook and interpret the Plan in a manner consistent with its uniform classifications would not be rendered unreasonable by UHC's decision in 2009.

2.

The second piece of evidence that Hooper seeks to rely upon is an affidavit executed by Dr. Cassas in 2015, in which Dr. Cassas offers his opinion that Mrs. Hooper's 2010 steroid injections, while admittedly contained within the CPT codebook section for musculoskeletal surgical procedures, should not have been considered a musculoskeletal surgical procedure.

We find no error in the district court's refusal to consider this item of evidence either. At the time that Michelin made its decision, Dr. Cassas had selected and submitted the appropriate CPT codes for the steroid injections. Despite UHC and Michelin's repeated invitations to Hooper to submit any and all information that might support the first-level appeal to UHC and the second-level appeal to Michelin, Hooper did not submit Dr. Cassas's opinion in affidavit form or otherwise. Thus, Michelin could not possibly have known that Dr. Cassas had a different opinion. Even if we were to consider this belated and isolated opinion, however, we could not say that Dr. Cassas's opinion of what procedures should or should not be included within the umbrella of musculoskeletal surgery, based upon his opinion and basic medical dictionary definitions, renders Michelin's decision to rely upon the CPT codebook's contrary classification an unreasonable or unprincipled one.

20

IV.

For the foregoing reasons, we find no abuse of discretion in Michelin's decision not to provide additional insurance coverage for Mrs. Hooper's steroid injections and no error in the district court's refusal to consider the information that Hooper failed to present during the administrative appeals process. Accordingly, we affirm the district court's grant of summary judgment in favor of Michelin and UHC in its entirety.

*AFFIRMED*