**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

CYNTHIA K. GILLIAM,
                 *Plaintiff-Appellant,*

v.

NEVADA POWER COMPANY; NEVADA
POWER COMPANY SUPPLEMENTAL
EXECUTIVE RETIREMENT PLAN;
SIERRA PACIFIC RESOURCES; SIERRA
PACIFIC RESOURCES SUPPLEMENTAL
EXECUTIVE RETIREMENT PLAN,
                 *Defendants-Appellees.*

No. 04-17201

D.C. No.
CV-03-01013-PMP

OPINION

Appeal from the United States District Court
for the District of Nevada
Philip M. Pro, District Judge, Presiding

Argued and Submitted
October 19, 2006—San Francisco, California

Filed May 31, 2007

Before: Melvin Brunetti, Diarmuid F. O'Scannlain, and
Stephen S. Trott, Circuit Judges.

Opinion by Judge O'Scannlain

**COUNSEL**

Daniel Marks, Law Office of Daniel Marks, Las Vegas, Nevada, argued the cause for the plaintiff-appellant, and filed briefs.

Gerald Mikesell, Nevada Power Company, Las Vegas, Nevada, argued the cause for the defendants-appellees, and filed a brief.

**OPINION**

O'SCANNLAIN, Circuit Judge:

We are asked to decide whether severance pay should be included as "earnings" for purposes of calculating an employee's retirement benefits.

I

In 1974 Cynthia K. Gilliam ("Gilliam") began working for Nevada Power Company, an investor-owned public utility that provides electric service to southern Nevada. She ultimately was promoted to Vice President of Retail Customer Operations in 1993, where she remained until 1999.

In 1986, Nevada Power Company established the Nevada Power Company Supplemental Executive Retirement Plan ("NPC Plan"), a non-qualified pension plan intended to provide retirement benefits to certain highly-compensated executives selected by the Board of Directors. In 1989, the Board made Gilliam a participant in the NPC Plan.

In anticipation of a possible merger, Gilliam and Nevada Power Company executed a three-year employment agreement in 1998. The agreement provided that Gilliam would

receive severance pay and certain other benefits if her employment was terminated as a result of a "change in control" of the company. Subsequently, Nevada Power Company agreed to merge with Sierra Pacific Resources, an event that qualified as a change in control, as defined in Gilliam's employment agreement.

As part of the merger process, Nevada Power Company and Gilliam executed a voluntary severance agreement that cancelled and replaced her employment agreement. Pursuant to the severance agreement, Gilliam agreed voluntarily to terminate her active employment with the company on April 19, 1999.[1] The severance agreement also provided that Gilliam would receive severance pay in an amount equal to twice her base salary and twice her target bonus for 1999. The agreement specified that Gilliam's retirement benefits under the NPC Plan would fully vest on April 19, 1999, her termination date. In addition, it provided that Gilliam would be entitled to early retirement on September 1, 2003. Finally, the severance agreement stated that Nevada Power Company would pay Gilliam $12,000 in lieu of providing her with outplacement and related services, which would be excluded from the calculation of her retirement benefits. On April 26, 1999, Nevada Power Company paid Gilliam $512,500 as severance pay pursuant to the agreement.

After the merger was complete, the resulting Board of Directors combined the NPC Plan with the Sierra Pacific Resources Supplemental Executive Retirement Plan ("SPR Plan"), effective November 1, 1999. The preamble of the SPR Plan stated in part:

---

[1]The severance agreement provided that Gilliam would remain an inactive employee on personal leave after this date, but Nevada Power Company retained the right to terminate her employment as an inactive employee at an unspecified date in the future. On June 30, 1999, Nevada Power Company ultimately terminated Gilliam's inactive employment with the company, citing a "reduction in force" as the reason for the termination.

>The purpose of this amendment and complete restatement is to integrate the provisions of the predecessor Plan with the provisions of the Nevada Power Supplemental Executive Retirement Plan [the NPC Plan]. Effective November 1, 1999, this Plan [the SPR Plan] shall become the successor to those two predecessor plans and [the Sierra Pacific Company] will become the Plan Sponsor. Unless expressly stated by any amendment to this Plan, benefits for Participants who retire or terminate employment prior to the effective date of any amendment shall not be affected by any such amendment.

Gilliam was never a participant in the SPR Plan, as defined in the plan documents.

In a letter dated February 3, 2003, Gilliam asked Nevada Power Company to confirm the amount of her early retirement benefits under the NPC Plan and informed the company that she would like to begin receiving her benefits on the early retirement date specified in her severance agreement. Relying on the income reported in Box 1 of her federal Form W-2s for the years 1997-1999, the latter year including her $512,500 severance payment, Gilliam claimed that her retirement benefits under the NPC Plan totaled $145,279.56 per year ($12,106.63 per month).

In response, the plan administrator for Sierra Pacific Resources considered Gilliam's letter a claim for benefits and denied it. The plan administrator informed Gilliam that she "mistakenly included" her severance pay in her calculation of retirement benefits, which, the plan administrator contended, "has consistently been excluded from [the NPC Plan] earnings because it is not 'wages and salary.' " Excluding Gilliam's severance pay from the calculation, the plan administrator asserted that Gilliam was entitled to receive retirement benefits of only $60,289.56 per year ($5,024.13 per month).

Gilliam appealed the denial of benefits to the Sierra Pacific Benefits Committee, which unanimously upheld the plan administrator's decision. Gilliam then filed suit in district court against Nevada Power Company, Nevada Power Company Supplemental Executive Retirement Plan, Sierra Pacific Resources, and Sierra Pacific Resources Supplemental Executive Retirement Plan (hereinafter collectively "Nevada Power Company"), challenging the denial of her retirement benefits under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1132(a)(1)(B).[2] On cross-motions for summary judgment, the district court granted summary judgment in favor of Nevada Power Company. Concluding that a de novo standard of review applied to its review of the plan administrator's denial of Gilliam's benefits, the district court held that the plan administrator properly excluded Gilliam's severance pay from the calculation of retirement benefits.

Gilliam timely appealed.

II

As a threshold matter, Nevada Power Company argues on appeal that the district court erred in reviewing the plan administrator's denial of Gilliam's claim de novo rather than for abuse of discretion.[3]

---

[2]The cited section permits a participant in an ERISA-regulated plan to bring a civil action "to recover benefits due to [her] under the terms of [her] plan, to enforce [her] rights under the terms of the plan, or to clarify [her] rights to future benefits under the terms of the plan." 29 U.S.C. § 1132(a)(1)(B). Neither party disputes that the NPC Plan is an "employee benefit plan" governed by ERISA, 29 U.S.C. §§ 1001-1461.

[3]We reject Gilliam's suggestion at oral argument that, because Nevada Power Company failed to cross-appeal, we are precluded from considering its argument that the district court erred by not applying an abuse of discretion standard of review. Generally, " 'a cross-appeal is required to support modification of the judgment,' " *Engleson v. Burlington N. R.R. Co.*, 972 F.2d 1038, 1041 (9th Cir. 1992) (citation omitted), and "[a]n appellee who fails to file a cross-appeal cannot attack a judgment with the view

Gilliam maintained in the district court, and Nevada Power Company conceded, that the NPC Plan is a so-called "top hat" plan under ERISA. The Act defines a top hat plan as one "which is unfunded and is maintained by an employer primarily for the purpose of providing deferred compensation for a select group of management or highly compensated employees." 29 U.S.C. §§ 1051(2), 1081(a)(3), 1101(a)(1). This is no small matter. "Because of these limitations, top hat plans form a rare sub-species of ERISA plans, and Congress created a special regime to cover them." *In re New Valley Corp.*, 89 F.3d 143, 148 (3d Cir. 1996). ERISA exempts such plans

towards enlarging his own rights," *Spurlock v. FBI*, 69 F.3d 1010, 1018 (9th Cir. 1995). However, "arguments that support the judgment as entered can be made without a cross-appeal . . . . even where the argument being raised has been explicitly rejected by the district court." *Engleson*, 972 F.2d at 1041 (citations and internal quotation marks omitted). Here, Nevada Power Company does not seek to enlarge its rights or lessen Gilliam's. Instead, as the prevailing party, Nevada Power Company offers a slightly different ground to support affirming the judgment of the district court. Thus, we may consider Nevada Power Company's standard-of-review argument even though it failed to cross-appeal. *See Johnson v. Enron Corp.*, 906 F.2d 1234, 1238 (8th Cir. 1990) (concluding that an appellee could challenge the standard of review applied by the district court without cross-appealing); *Butts v. Cont'l Cas. Co.*, 357 F.3d 835, 837 n.2 (8th Cir. 2004) (same).

We review de novo the district court's grant of summary judgment. *Simkins v. NevadaCare, Inc.*, 229 F.3d 729, 733 (9th Cir. 2000). "Viewing the evidence in the light most favorable to the nonmoving party and drawing all reasonable inferences in its favor, an appellate court must determine whether the district court correctly applied the relevant substantive law and whether there are any genuine issues of material fact." *Id. But see Bard v. Boston Shipping Ass'n*, 471 F.3d 229, 235 (1st Cir. 2006) ("We review the district court's grant of summary judgment de novo. In the ERISA context, summary judgment is merely a vehicle for deciding the case; the factual determination of eligibility for benefits is decided solely on the administrative record, and 'the non-moving party is not entitled to the usual inferences in its favor.' " (citations omitted)). We also "review de novo a district court's choice and application of the standard of review to decisions by fiduciaries in ERISA cases." *Abatie v. Alta Health & Life Ins. Co.*, 458 F.3d 955, 962 (9th Cir. 2006) (en banc).

"from the fiduciary, funding, participation and vesting requirements applicable to other employee benefit plans." *Duggan v. Hobbs*, 99 F.3d 307, 310 (9th Cir. 1996) (citing 29 U.S.C. § 1101(a)(1) (exemption from fiduciary responsibilities); *id.* § 1081(a)(3) (exemption from minimum funding standards); *id.* § 1051(2) (exemption from participation and vesting requirements)).

Nevertheless, the parties and the district court assumed that the standard-of-review framework set forth in *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101 (1989), applies to top hat plans. There, the Supreme Court held that a court reviews a plan administrator's denial of benefits for abuse of discretion if the ERISA plan unambiguously grants the plan administrator discretionary authority to determine the eligibility for benefits or to construe the terms of the plan. *Firestone*, 489 U.S. at 115.[4] On the other hand, if the ERISA plan fails unambiguously to grant the plan administrator such discretionary authority, the Supreme Court held that a court reviews the plan administrator's denial of benefits de novo. *Firestone*, 489 U.S. at 115. Notably, *Firestone* involved employee pension benefit plans and employee welfare benefit plans under ERISA, not top hat plans.[5]

---

[4]*See also Abatie*, 458 F.3d at 967 ("We read *Firestone* to require abuse of discretion review whenever an ERISA plan grants discretion to the plan administrator, but a review informed by the nature, extent, and effect on the decision-making process of any conflict of interest that may appear in the record.").

[5]ERISA defines an "employee pension benefit plan" as "any plan, fund, or program which was heretofore or is hereafter established or maintained by an employer or by an employee organization, or by both, to the extent that by its express terms or as a result of surrounding circumstances such plan, fund, or program—(i) provides retirement income to employees, or (ii) results in a deferral of income by employees for periods extending to the termination of covered employment or beyond, regardless of the method of calculating the contributions made to the plan, the method of calculating the benefits under the plan or the method of distributing benefits from the plan." 29 U.S.C. § 1002(2)(A).

We are less certain than the parties that the *Firestone* standard-of-review framework also applies to top hat plans. The Third Circuit, for one, has held that de novo review applies to top hat plans even when they grant plan administrators discretion because "a top hat administrator has no fiduciary responsibilities" under ERISA. *Goldstein v. Johnson & Johnson*, 251 F.3d 433, 443 (3d Cir. 2001). Recently following suit, the Eighth Circuit concluded that *Firestone* does not apply to top hat plans, because "the policy considerations relied upon in [that case] to trigger abuse-of-discretion review . . . are simply not present in the case of a top hat plan." *Craig v. Pillsbury Non-Qualified Pension Plan*, 458 F.3d 748, 752 (8th Cir. 2006). The Seventh Circuit, however, assumed without discussion that *Firestone* applied to top hat plans. *See Olander v. Bucyrus-Erie Co.*, 187 F.3d 599, 606-08 (7th Cir. 1999).

---

An "employee welfare benefit plan" is defined by ERISA as "any plan, fund, or program which was heretofore or is hereafter established or maintained by an employer or by an employee organization, or by both, to the extent that such plan, fund, or program was established or is maintained for the purpose of providing for its participants or their beneficiaries, through the purchase of insurance or otherwise, (A) medical, surgical, or hospital care or benefits, or benefits in the event of sickness, accident, disability, death or unemployment, or vacation benefits, apprenticeship or other training programs, or day care centers, scholarship funds, or prepaid legal services, or (B) any benefit described in section 186(c) of this title (other than pensions on retirement or death, and insurance to provide such pensions)." *Id.* § 1002(1).

"A comparison of the statutory definitions of a welfare plan and a pension plan shows that the only significant difference between these varieties of employee benefit plans is the nature of the benefit furnished—a pension plan provides retirement income or other deferred income, while a welfare plan provides benefits upon the occurrence of various specified contingencies." 1 ERISA Practice & Procedure § 2:5, 2-16 to -17 (2d ed. 2005). "Top hat plans represent a special category of ERISA [pension benefit plans] that provide compensation arrangements to a select group of management-level employees." *Id.* § 2:4, at 2-9.

We need not decide as a matter of first impression in this circuit whether the *Firestone* standard-of-review framework applies to top hat plans or, if it does, whether the district court should have applied an abuse of discretion rather than a de novo standard of review.[6] The question in this case turns on the interpretation of the term "earnings" under the NPC Plan and we would reach the same conclusion under either standard of review. *See Richardson v. Pension Plan of Bethlehem Steel Corp.*, 112 F.3d 982, 985 (9th Cir. 1997) (declining to rule on whether the de novo or abuse of discretion standard of review applied, because the former employees' claims failed even under the more stringent de novo standard).

III

The parties agree that the NPC Plan governs the calculation of Gilliam's retirement benefits. Gilliam, however, contends that the district court erred in concluding that her severance pay of $512,500 should be excluded from the calculation of her retirement benefits under that plan. We consider this argument now.

A

Although "[a]n ERISA plan is a contract," *see Bland v. Fiatallis N. Am., Inc.*, 401 F.3d 779, 783 (7th Cir. 2005), "ERISA does not contain a body of contract law to govern the interpretation and enforcement of employee benefit plans," *Richardson*, 112 F.3d at 985. We therefore "apply contract principles derived from state law . . . guided by the policies expressed in ERISA and other federal labor laws." *Id.* "Accordingly, we have held that terms in an ERISA plan should be interpreted 'in an ordinary and popular sense as would a

---

[6]If the *Firestone* framework controlled in this case, we would have to decide another novel question in this circuit: when determining the applicable standard of review, should a court look to Nevada Power Company's NPC Plan in effect when Gilliam's benefits vested or Sierra Pacific Resources' SPR Plan in effect when her benefit claim was denied?

[person] of average intelligence and experience.' " *Id.* (alteration in original) (quoting *Evans v. Safeco Life Ins. Co.*, 916 F.2d 1437, 1441 (9th Cir. 1990)). More specifically, " '[w]hen disputes arise, courts should first look to explicit language of the agreement to determine, if possible, the clear intent of the parties. The intended meaning of even the most explicit language can, of course, only be understood in the light of the context that gave rise to its inclusion.' " *Id.* (alteration in original) (quoting *Armistead v. Vernitron Corp.*, 944 F.2d 1287, 1293 (6th Cir. 1991) (citations omitted)). Moreover, we endeavor to interpret each provision consistent "with the entire document such that no provision is rendered nugatory." *Id.* When a plan is ambiguous, however, a court typically "will examine extrinsic evidence to determine the intent of the parties." *Id.*

B

1

**[1]** With these principles in mind, we now return to the plan at issue in this case. The NPC Plan provides that Gilliam's retirement benefits at a normal retirement date equal "3.0% of *Final Average Earnings* times Service up to 15 years, plus 1.5% of *Final Average Earnings* times Service in excess of 15 years less 100% of the Participant's benefit payable at Retirement under the Qualified Plan." (emphasis added.) The plan defines "Final Average Earnings" to mean "the average of the highest consecutive 36 months of *Service Earnings* of a Participant." (emphasis added.) The plan further defines the term "Service" as "a Participant's full and partial years of employment (calculated in completed calendar months) from date of hire to date of termination, but not later than attainment of Age 65," and defines "Earnings" as "a Participant's *total wages and salary as reported by the Company for federal income tax purposes for the calendar year*. However, bonuses will be reflected in the year earned (not in the year paid) and will be assumed to be earned ratably over the months actually

worked during such year." (emphasis added.) Not surprisingly, the definition of the term "earnings" under the NPC Plan is at the center of this dispute. Our task therefore is to determine whether "total wages and salary as reported by the Company for federal income tax purposes for the calendar year"—the plan's definition of "earnings"—includes Gilliam's severance pay of $512,500.

2

Significant portions of the parties' briefs are devoted to arguments as to whether severance pay is considered "wages or salary" as defined under the Internal Revenue Code. While interesting, we do not consider it necessary to venture through the intricacies of that complex body of law here. We believe that a natural reading of the plan's definition of "earnings" suggests that the parties intended two separate inquires: First, is the payment—here, the $512,500 severance payment to Gilliam—"wages and salary"? Second, if the payment is "wages and salary," was it "*reported* by the [Nevada Power] Company for federal income tax purposes for the *calendar year*"? (emphasis added.) Neither inquiry requires us to determine whether the payment is "wages and salary" as *defined* under the Internal Revenue Code. Instead, the plan agreement simply defines the term "earnings" as "total wages and salary as *reported* by the Company for federal income tax purposes for the calendar year." (emphasis added.) Accordingly, we do not believe the parties intended to incorporate by reference the definition of "wages and salary" from the Internal Revenue Code. And it is a familiar principle of contract law that unless a contract is voidable, we "must enforce it as drafted by the parties, according to the terms employed, and may not make a new contract for the parties or rewrite their contract while purporting to interpret or construe it." 11 Williston on Contracts § 31:5, at 299 (4th ed. 1999) (footnotes omitted).

3

**[2]** Because the plan is silent as to the definition of the phrase "wages and salary," we look to the dictionary defini-

tion to determine the ordinary and popular meaning. *See Deegan v. Cont'l Cas. Co.*, 167 F.3d 502, 507 (9th Cir. 1999). *Black's Law Dictionary* defines the term "wage" as "[p]ayment for labor or services, usu[ally] based on time worked or quantity produced . . . . [and includes] every form of remuneration payable for a given period to an individual for personal services, including salaries, commissions, vacation pay, bonuses, and the reasonable value of board, lodging, payments in kind, tips, and any similar advantage received from the employer." Black's Law Dictionary 1610 (8th ed. 1999). Similarly, *Black's* defines the term "salary" as "[a]n agreed compensation for services—esp[ecially] professional or semiprofessional services—usu[ally] paid at regular intervals on a yearly basis." *Id.* at 1365. The parties do not contend, nor do we believe, that the phrase "wages and salary" is ambiguous. In short, we are persuaded that the ordinary and common meaning of "wages and salary," as used in the NPC Plan, is remuneration for services.

That the term "earnings" is modified by the term "service" in the NPC Plan further bolsters our conclusion that the meaning of "wages and salary" is limited to remuneration for the performance of services. Specifically, Gilliam's retirement benefits are calculated based on her "*Service* Earnings," and the term "Service" is limited to her "full and partial years of employment (calculated in completed calendar months) from date of hire to date of termination." (emphasis added.)

With these definitions in hand, we now must determine whether the severance payment to Gilliam in the amount of $512,500 was remuneration for services. Her severance pay was part of a severance agreement whereby Gilliam agreed voluntarily to terminate her employment, to preserve as confidential certain information, to refrain from competing with Nevada Power Company for a limited period in a specified area, and to waive and to release certain rights and claims against Nevada Power Company. The severance agreement further provided that it "is intended as a final settlement of

any and all claims, known or unknown, that [Gilliam] may have against [Nevada Power] Company, including but not limited to all rights [Gilliam] may have pursuant to her Employment Agreement." This comports with the common understanding of the term "severance pay," which *Black's* defines as "[m]oney (apart from back wages or salary) paid by an employer to a dismissed employee . . . . often made in exchange for a release of any claims that the employee might have against the employer." Black's Law Dictionary 1406. And we have previously observed that severance pay "in general is intended to tide an employee over while seeking a new job, [and] certainly could be considered an 'unemployment benefit.' " *Jung v. FMC Corp.*, 755 F.2d 708, 711 n.2 (9th Cir. 1985) (internal quotation marks omitted), *abrogated by Firestone*, 489 U.S. at 115.

[3] We are unpersuaded that the plain meaning of "wages and salary," for purposes of defining "earnings" in the NPC Plan, includes Gilliam's severance pay. Simply put, "wages and salary," as used in the definition of "earnings" in the plan, includes only payment for *services*.[7] Gilliam's severance pay was not for services, but for her voluntary termination of employment, confidentiality, non-competition, and waiver of

---

[7]We reject Gilliam's argument that the district court's conclusion is contrary to the plain language of the NPC Plan because her severance pay was reported in Box 1 of the federal Form W-2 for 1999 and because "[t]here is but one way a company reports an employee's 'total wages and salary for federal income tax purposes for the calendar year,' and that is with a federal Form W2, Wage and Tax Statement." This argument rests on the logical fallacy of affirming the consequent. While Nevada Power Company must report "wages and salary" on Box 1 of the federal Form W-2, not all amounts reported in Box 1 of the federal Form W-2 must be "wages and salary." For example, the *1999 Instructions for Forms W-2 and W-3* explain that Box 1 includes many employee income items other than "wages and salary." *See Internal Revenue Service, 1999 Instructions for Forms W-2 and W-3*, at 7 (1999), *available at* http://www.irs.gov/pub/irs--prior/iw2-1999.pdf; *see also Cent. Ill. Pub. Serv. Co. v. United States*, 435 U.S. 21, 25 (1978) ("Wages usually are income, but many items qualify as income and yet clearly are not wages.").

claims against Nevada Power Company. Accordingly, we conclude that the district court did not err in holding that "a plain reading of the NPC [Plan's] definition of Earnings . . . cannot reasonably be interpreted to include severance pay given to an employee to no longer work, notwithstanding the fact that severance pay may be subject to federal income tax."[8]

**AFFIRMED.**

---

[8]Nevada Power Company also challenges the district court's purported consideration of evidence not before the plan administrator. While we question whether Nevada Power Company may raise this argument without cross-appealing, we are ultimately unpersuaded by this contention. Nevada Power Company has failed to show that the district court abused its discretion by admitting any additional evidence. *See Abatie*, 458 F.3d at 970 (concluding that, "in general, a district court may review only the administrative record when considering whether the plan administrator abused its discretion, but may admit additional evidence on de novo review"). Moreover, even if the district court had erred, Nevada Power Company has failed to demonstrate prejudice.