**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

SCOTT C. WOLF,
　　　　　　*Plaintiff-Appellee*,

v.

LIFE INSURANCE COMPANY OF
NORTH AMERICA,
　　　　　　*Defendant-Appellant*.

No. 21-35485

D.C. No.
3:20-cv-05684-
BHS

OPINION

Appeal from the United States District Court
for the Western District of Washington
Benjamin H. Settle, District Judge, Presiding

Argued and Submitted June 8, 2022
Seattle, Washington

Filed August 25, 2022

Before: Ronald Lee Gilman,[*] Sandra S. Ikuta, and
Eric D. Miller, Circuit Judges.

Opinion by Judge Gilman;
Concurrence by Judge Ikuta

---

[*] The Honorable Ronald Lee Gilman, United States Circuit Judge for the U.S. Court of Appeals for the Sixth Circuit, sitting by designation.

**SUMMARY**[**]

**ERISA**

The panel affirmed the district court's summary judgment in favor of the plaintiff in an action under the Employee Retirement Income Security Act concerning the denial of an insurance claim based on the plaintiff's son's accidental death.

The son died in a one-car collision. He was intoxicated and had been driving at a high speed in the wrong direction down a one-way road when he hit a speed bump and lost control of the car, which ultimately flipped over and landed upside down in a body of water adjoining the road. The accidental death and dismemberment insurance policy obtained from defendant Life Insurance Company of North America (LINA) by the plaintiff via his employer paid benefits for a "Covered Accident," defined as "[a] sudden, unforeseeable, external event that results, directly and independently of all other causes."

Reviewing de novo, the panel held that to determine whether the son's death was the result of an "accident" under the policy, it must apply the *Padfield* test, an "overlapping subjective and objective inquiry." The panel concluded that, under this test, there was insufficient evidence in the administrative record to determine the son's subjective expectation at the time he died. Proceeding to the objective inquiry, the panel declined to consider for the first time on appeal LINA's argument that because the policy defined the

---

[**] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

term "accident" as "a sudden, unforeseeable, external event," the district court should have asked whether the son's death was "reasonably foreseeable" rather than applying the *Padfield* test by asking whether his death was "substantially certain."  Declining to apply an exception for purely legal issues, the panel concluded that the plaintiff would be unduly prejudiced by the belated application of a "reasonably foreseeable" test because not only did LINA fail to raise the argument below, but it also did not use that test when initially denying the plaintiff's insurance claim.  The panel held that, under the *Padfield* test, the son's death was an "accident" because, while the facts demonstrated that the son engaged in reckless conduct, the record did not show that his death was "substantially certain" to result from that conduct. Accordingly, the district court correctly determined that the son's death was covered under the insurance policy.

Concurring, Judge Ikuta stated that she wrote separately to emphasize that the panel's opinion applied the definition of an "accident" set forth in *Padfield v. AIG Life Ins. Co.*, 290 F.3d 1121 (9th Cir. 2002), only because LINA relied on *Padfield* and forfeited its argument the insurance policy's own definition of "accident" applied.

---

**COUNSEL**

Charles C. Huber (argued), D. Michael Reilly, and Ryan P. McBride, Lane Powell PC, Seattle, Washington, for Defendant-Appellant.

Glenn R. Kantor (argued), Sally Mermelstein, Sarah J. Demers, and Stacy Monahan Tucker, Kantor & Kantor LLP, Northridge, California, for Plaintiff-Appellee.

**OPINION**

GILMAN, Circuit Judge:

Scott Wolf, Jr. (Scott) died in a one-car collision. He was intoxicated and had been driving at a high speed in the wrong direction down a one-way road when he hit a speed bump and lost control of the car, which ultimately flipped over and landed upside down in a body of water adjoining the road. Scott Wolf, Sr. (Wolf), Scott's father, brought suit against Life Insurance Company of North America (LINA), alleging that LINA wrongfully denied his insurance claim based on Scott's accidental death. The district court granted Wolf's motion for summary judgment.

On appeal, LINA argues that, under the language of the insurance policy, an event is not an "accident" if it is "reasonably foreseeable." But LINA did not present that argument to the district court, nor to Wolf when it denied his claim, so it has forfeited that argument here. The appropriate test for whether the death in this case was an "accident" is therefore the one that the district court applied, which asks whether the resulting death was "substantially certain" to occur from the insured's conduct. Although the insured's conduct here was extremely reckless, the district court correctly concluded that his death was not "substantially certain" to occur. Accordingly, we **AFFIRM** the judgment of the district court.

## I.  BACKGROUND

### A.  The AD&D policy

Wolf maintains an accidental death and dismemberment (AD&D) insurance policy from LINA through his employer. The policy pays benefits for, among other things, a "Covered

Accident," which is defined as "[a] sudden, unforeseeable, external event that results, directly and independently of all other causes." Scott, Wolf's 26-year-old son, was insured under this policy for $50,000 as his parents' dependent.

The policy includes a list of exclusions to coverage, such as for injuries resulting from skydiving, hang-gliding, parachuting, or acrobatic flying. Notably, however, the policy does not have any exclusion for incidents occurring while the insured was under the influence of alcohol, speeding, or engaged in reckless conduct.

## B. Scott's fatal drive

The incident in question occurred around 4:00 a.m. on August 19, 2018 in Clearwater, Florida. Witnesses reported that Scott was driving in the wrong direction on a one-way service road next to the Courtney Campbell Causeway, which is surrounded on both sides by water. The police later determined that Scott was traveling at approximately 65 miles per hour, despite the service road having a speed limit of 10 miles per hour. He hit a speed bump, which caused him to lose control of the car, overcorrect, and veer off the road. His car then struck several tree stumps, went airborne over the rocky coastline, and landed upside-down in the adjacent bay.

A deputy from the Clearwater Police Department quickly arrived on scene and pulled Scott from the submerged, overturned car with the assistance of a nearby onlooker. Scott was transported to a local hospital, where he was pronounced dead. After performing an autopsy, the county medical examiner determined that Scott had suffered blunt-impact injures to the head and neck and had died as a result of drowning. The examiner listed the "manner of death" as "Accident (Drove automobile off roadway into bay

while intoxicated)." In addition, the medical examiner's toxicology report revealed that Scott had a blood alcohol content (BAC) of .20 grams per deciliter (0.20%).

## C. LINA's denial of coverage

Wolf filed a timely claim for accidental-death benefits with LINA in June 2019. Roughly one month later, LINA issued a denial letter, concluding "that Scott's death was a *foreseeable* outcome of his voluntary actions, and thus, the loss was not a result of a *Covered Accident* as the term is defined" under the policy (emphases in original). In explaining its decision, LINA wrote:

> *Foreseeability* can be analyzed by examining whether the Insured's intentional conduct was objectively reasonable, or reasonable based on the judgment of a similar individual. Because we cannot determine Scott's subjective expectation prior to the incident, we must consider whether a reasonable person with a similar background would have viewed serious injury or death as highly likely to occur. He was a 26 year old with a valid Driver's License and a Bachelor's Degree, employed as a Technical Manager for a company contracted by the U.S. Department of Energy. The impairments associated with a BAC of 0.20% also support that he was operating his vehicle under highly unsafe conditions. For these reasons, it is reasonable to assume that a person of similar education and age-based experience would have understood that serious injury or even death would be highly likely to occur while operating a vehicle . . . with a BAC of 0.20%

and speeding at 6.5 times over the legal speed limit, the wrong way down a road.

(emphasis in original).

Wolf appealed, contending that if LINA "wanted to exclude coverage for accidental deaths arising from negligent or even reckless conduct on behalf of the deceased, they should have stated so in plain English." He further pointed out that the death certificate stated that Scott's death was both an accident and was due to drowning.

In reviewing Wolf's internal appeal, LINA engaged a toxicologist, Dr. Theodore Siek, to opine on what impact Scott's intoxication level might have had on his driving. Dr. Siek observed that the "physical and mental impairments" of someone with a BAC above 0.18% "include: 1) loss of the sense of care and caution, 2) a slower perception and reaction time, 3) loss of coordination, and 4) less ability to multi-task." He further opined that Scott's "immunity to pain, loss of coordination, and inability to perceive his dangerous situation were all impacted by [Scott's] gross ethanol intoxication. Both his driving ability, his attitude about safety, and ability to rescue himself from drowning were all significant factors in his accident and drowning death."

Citing Dr. Siek's statements, LINA upheld its denial of benefits following Wolf's internal appeal. LINA again explained its analytical framework for assessing whether an event was an "accident" under the policy:

> The analytical framework to determine if the event was unforeseeable is for [LINA] to determine if the insured subjectively lacked an expectation of death or injury. If so, LINA

asks whether the suppositions that underlay the insured's expectation were reasonable, from the perspective of the insured, allowing the insured a great deal of latitude and taking into account the insured's personal characteristics and experiences. If the subjective expectation of the insured cannot be ascertained, LINA asks whether a reasonable person, with background and characteristics similar to the insured, would have viewed the resulting injury or death as a probable consequence highly likely to occur as a result from the insured's conduct. *Given the common meanings of the words, we interpret highly likely to occur to entail a level of inevitability that is of a significant or large degree.*

(emphasis added.)  LINA concluded that a reasonable person with a background and characteristics similar to Scott's "would have viewed the resulting death as a probable consequence substantially likely to occur."

## D.  The instant lawsuit

Wolf sued LINA for benefits under the Employee Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. §§ 1132(a), (e), (f) and (g).  The parties informed the district court that they would file simultaneous cross-motions and responsive briefs.  They proposed that the court's judgment be based entirely on the briefs and the administrative record.

LINA moved for judgment under Rule 52 of the Federal Rules of Civil Procedure, and Wolf filed a motion for summary judgment under Rule 56 of the Federal R ules of

Civil Procedure.   In his motion, Wolf cited statistical information on drunk driving that was not part of the administrative record.   After concluding that it would not consider Wolf's statistical information, the district court analyzed the case under the framework adopted by this court in *Padfield v. AIG Life Insurance Co.*, 290 F.3d 1121 (9th Cir. 2002).

The district court acknowledged that "Scott was engaging in extremely reckless behavior," but concluded that "a reasonable person would not have viewed [Scott's fatal] injury as substantially certain to occur as a result of his actions, rendering his death accidental under the policy." LINA has timely appealed that ruling.

## II.  ANALYSIS

### A.  Standard of review

In an appeal under ERISA, we review de novo a district court's grant of summary judgment, employing the same standard that governed the district court's review of the plan administrator's decision.  *Williams v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, 792 F.3d 1136, 1139 (9th Cir. 2015). De novo review applies to the denial of benefits under an ERISA-governed insurance policy where, as is undisputed here, the policy does not assign the administrator discretionary authority to determine eligibility of benefits or to construe the plan's terms.  *Padfield*, 290 F.3d at 1124–25. In such cases, we "simply proceed[] to evaluate whether the plan administrator correctly or incorrectly denied benefits." *Abatie v. Alta Health & Life Ins. Co.*, 458 F.3d 955, 963 (9th Cir. 2006) (en banc).

**B.  The *Padfield* test controls**

The key question before us is a narrow one:  was Scott's death the result of an "accident" under his father's insurance policy?  But in order to answer that question, we must first decide how to define the word "accident."

To determine whether an event is an "accident" under an ERISA-governed AD&D policy, this court has endorsed the widely accepted framework announced in the seminal case of *Wickman v. Northwestern National Insurance Co.*, 908 F.2d 1077 (1st Cir. 1990).  *Padfield*, 290 F.3d at 1126.  That analysis involves an "overlapping subjective and objective inquiry" under which

> [t]he court first asks whether the insured subjectively lacked an expectation of death or injury.  If so, the court asks whether the suppositions that underlay the insured's expectation were reasonable, from the perspective of the insured, allowing the insured a great deal of latitude and taking into account the insured's personal characteristics and experiences.   If the subjective expectation of the insured cannot be ascertained, the court asks whether a reasonable person, with background and characteristics similar to the insured, would have viewed the resulting injury or death as substantially certain to result from the insured's conduct.

*Id*. (citations omitted).

*Padfield* recognized that courts applying the *Wickman* framework "have used a number of slightly different verbal

formulations to describe the objective portion of the inquiry." *Id*. Some courts ask whether a reasonable person similarly situated to the insured would view the resulting injury as "highly likely," whereas others use "substantially certain" or "substantially likely." *Id*. at 1127 (citations omitted). But this court held "that the 'substantially certain' test is the most appropriate one, for it best allows the objective inquiry to 'serve as a good proxy for actual expectation.'" *Id*. (alterations omitted) (quoting *Wickman*, 908 F.2d at 1088).

We begin by looking to the subjective portion of the *Padfield* test. The district court correctly concluded that there is insufficient evidence in the administrative record to determine Scott's subjective expectation at the time he died. In Wolf's view, two facts reveal Scott's subjective expectations: (1) Scott was wearing his seatbelt when he crashed, and (2) he had turned on his hazard lights. According to Wolf, these facts suggest that Scott had no expectation of impending death. But these two facts do not shed sufficient light on Scott's actual state of mind, nor does anything else in the administrative record.

We thus proceed to the objective inquiry, which is where the crux of the parties' disagreement lies. LINA argues that because the policy defines the term "accident" as "a sudden, unforeseeable, external event," the district court should have asked whether Scott's death was "reasonably foreseeable" rather than applying the *Padfield* test by asking whether his death was "substantially certain."

But LINA never made this argument to the district court. LINA averred generally that Scott's death should not be deemed an "accident" under the terms of the policy, but as its counsel acknowledged at oral argument on appeal, it never specifically argued that the district court should apply

a "reasonably foreseeable" test instead of *Padfield*'s "substantially certain" test.   To the contrary, LINA represented to the district court that the *Padfield* test governed, and it argued that under that test, Scott's death was not an accident.

We generally do not consider arguments raised for the first time on appeal. *Momox-Caselis v. Donohue*, 987 F.3d 835, 841 (9th Cir. 2021).  This rule, however, is subject to several exceptions, one of which is where "the issue presented is purely one of law and the opposing party will suffer no prejudice as a result of the failure to raise the issue in the trial court." *Kaass Law v. Wells Fargo Bank, N.A.*, 799 F.3d 1290, 1293 (9th Cir. 2015) (citation omitted).

LINA asks us to invoke that exception here, insisting that we may consider the argument, despite any failure to raise it below, because it is a purely legal issue and we are conducting a de novo review.  But Wolf would be unduly prejudiced by the belated application of a "reasonably foreseeable" test because not only did LINA fail to raise the argument below, it also did not use that test when initially denying Wolf's claim.

LINA relied on *Padfield*'s "substantially certain" test, or something very close to it, to define "unforeseeable" in its initial denial of Wolf's claim and on his internal appeal. "When making a claim determination under ERISA, an administrator may not hold in reserve a known or reasonably knowable reason for denying a claim, and give that reason for the first time when the claimant challenges a benefits denial in court." *Beverly Oaks Physicians Surgical Ctr., LLC v. Blue Cross & Blue Shield of Ill.*, 983 F.3d 435, 440 (9th Cir. 2020) (citations and internal quotation marks omitted).   This rule prevents a claimant from being "'sandbagged' by a rationale the plan administrator adduces

only after the suit has commenced." *Harlick v. Blue Shield of Cal.*, 686 F.3d 699, 720 (9th Cir. 2012) (citation omitted).

In its initial denial, LINA phrased the objective portion of the two-part test as whether a reasonable person similarly situated to the insured "would have viewed serious injury or death as highly likely to occur." Elaborating on this definition in its denial of Wolf's internal appeal, LINA stated that it "interpret[ed] highly likely to occur to entail a level of inevitability that is of a significant or large degree."

We believe that the difference between "significantly or largely inevitable" and "substantially certain" is purely semantic. In any event, LINA did not rely on a "reasonable foreseeability" test in denying coverage. It instead applied the "highly likely" common-law test for what is considered an "accident," as developed in the *Wickman* line of cases. At oral argument, LINA's counsel insisted that LINA was "writing to a standard it didn't have to meet." But whether it needed to meet that standard is beside the point. Having employed that standard in its denial of coverage, it may not now argue that the claim was denied because Scott's death was "reasonably foreseeable," which is "a far broader standard than an event that is reasonably viewed as 'highly likely to occur.'" *See McClelland v. Life Ins. Co. of N. Am.*, 679 F.3d 755, 760 n.3 (8th Cir. 2012).

LINA responds by arguing that this is not a new reason for denial, and that Wolf was not "sandbagged," because it consistently cited the "Covered Accident" provision as the reason for its denial. It notes that the denial letter states that "Scott's death was a *foreseeable* outcome of his voluntary actions." (emphasis in original). But LINA consistently defined "foreseeable" as "highly likely," which is "fundamentally inconsistent" with a definition of "reasonably foreseeable." *See King*, 414 F.3d at 1003

(concluding that the two standards represent different bases on which to consider a claim for benefits).

"The two definitions are at opposite poles" because "[t]he common law definition asks whether the victim could reasonably have expected to *escape* the injury," whereas the "foreseeability" test "asks whether the victim could reasonably have expected to *suffer* the injury." *King v. Hartford Life & Accident Ins. Co.*, 414 F.3d 994, 1008 (8th Cir. 2005) (en banc) (Bright, J., concurring) (emphases in original); *see also Johnson v. Am. United Life Ins. Co.*, 716 F.3d 813, 826 (4th Cir. 2013) (explaining the "significant difference between these standards"). Applying the "reasonably foreseeable" test would therefore constitute a new, post hoc rationale for the denial of Wolf's claim that would unduly prejudice Wolf.

"Requiring that plan administrators provide a participant with specific reasons for denial 'enable[s] the claimant to prepare adequately for any further administrative review, as well as appeal to the federal courts.'" *Mitchell v. CB Richard Ellis Long Term Disability Plan*, 611 F.3d 1192, 1199 n.2 (9th Cir. 2010) (alteration in original) (quoting *Halpin v. W.W. Grainger, Inc.*, 962 F.2d 685, 689 (7th Cir. 1992)). After being told that the claim was denied because Scott's death was "highly likely" to occur under the circumstances, Wolf was given an opportunity to appeal that decision both internally and in federal court by showing that Scott's death was not "highly likely" or "substantially certain" to occur.

But by waiting until the case was before this court to argue that a much lower standard of "accident" should apply to the claim, LINA denied Wolf the opportunity to present on the internal appeal different arguments and evidence that would likely be relevant if he had known that LINA was applying the lower standard. LINA's "reasonably

foreseeable" test has therefore been forfeited, and *Padfield*'s "substantially certain" test applies.

## C. Scott's death was an "accident" because his death was not "substantially certain" to occur under the circumstances

"The question of whether drunk-driving deaths or injuries are 'accidental' for purposes of accidental death insurance has perplexed the judiciary for some time." *Johnson*, 716 F.3d at 816. This court, however, has not previously had the occasion to weigh in and apply the *Padfield* test to a death or injury involving drunk driving.

Events that can cause death span a vast continuum that range from intentionally driving off a cliff into the ocean below (a clear suicide) to driving off a bridge that has suddenly collapsed due to a structural failure (an undisputed accident). All jurists would agree that an accidental-death policy, such as the one involved here, would exclude coverage for driving off the cliff but allow coverage for driving off the bridge. The facts of this case, as in most cases involving drunk driving, fall somewhere in between.

There is no categorical rule excluding insurance coverage for all alcohol-related deaths. *Stamp v. Metro. Life Ins Co.*, 531 F.3d 84, 91 (1st Cir. 2008). Instead, courts "have been careful to explain that the proper approach is fact-specific and that the decedent's degree of intoxication is particularly probative." *Id*. at 91 n.9. The key facts that we must consider here are that Scott had a BAC of 0.20% and was driving his car 65 miles per hour in the wrong direction in a 10-miles-per-hour zone at 4:00 a.m. Although these facts demonstrate that Scott undoubtedly engaged in reckless conduct, the record does not show that his death was "substantially certain" to result from that conduct.

Both Wolf and LINA cite various cases that support their respective positions as to whether drunk-driving deaths are "accidents." In considering the cited cases, we note a clear pattern between cases that applied de novo review versus those that applied the abuse-of-discretion or arbitrary-and-capricious standard.

To our knowledge, all of the relevant cases from our sister circuits have held that a drunk-driving death *was* a covered accident under an AD&D policy when applying de novo review. In each of the circuit cases that LINA cites, which vary in regard to the recklessness of the insured's actions, the courts were reviewing the administrator's decision under the abuse-of-discretion or arbitrary-and-capricious standard. That was because the plans at issue vested the administrator with discretionary authority to determine eligibility for benefits or to construe the policy's terms. *See Sanchez v. Life Ins. Co. of N. Am.*, 393 F. App'x 229, 230–32 (5th Cir. 2010) (BAC of 0.174%); *Davis v. Life Ins. Co. of N. Am.*, 379 F. App'x 393, 394–395 (5th Cir. 2010) (BAC between 0.28% and 0.36%); *Stamp*, 531 F.3d at 86, 87 (BAC of 0.265%); *Lennon v. Metro. Life Ins. Co.*, 504 F.3d 617, 619–620 (6th Cir. 2007) (BAC of 0.321%); *Eckelberry v. Reliastar Life Ins. Co.*, 469 F.3d 340, 342–343 (4th Cir. 2006) (BAC of 0.15%); *Cozzie v. Metro. Life Ins. Co.*, 140 F.3d 1104, 1106–08 (7th Cir. 1998) (BAC of 0.252%).

Under that far more deferential standard, courts "do not search for the best interpretation of a plan or even for one [they] might independently adopt"; instead, they ask only if the administrator's interpretation of the plan was "reasonable." *Eckelberry*, 469 F.3d at 343. Deferring to a "reasonable" interpretation is particularly significant, if not outcome-determinative, in an arena such as this where

judges and commentators alike have acknowledged the difficulty of determining what is an "accident" when drunk driving is involved. *See Lennon*, 504 F.3d at 627 & n. 2 (Clay, J., dissenting) (noting that "the barrage of case law" on the question of what the word "accident" means "suggests that the meaning of 'accidental' is anything but plain"); Douglas R. Richmond, *Drunk in the Serbonian Bog: Intoxicated Drivers' Deaths as Insurance Accidents*, 32 SEATTLE U. L. REV. 83, 83 (2008) (describing this as "an astonishingly difficult question to answer").

Notably, the two circuits that have considered this question de novo both held that the drunk-driving deaths at issue *were* accidents. *See Johnson*, 716 F.3d at 819, 822–23; *LaAsmar v. Phelps Dodge Corp. Life, Accidental Death & Dismemberment & Dependent Life Ins. Plan*, 605 F.3d 789, 800, 813–14 (10th Cir. 2010). The Eighth Circuit also reached the same result under the far more deferential abuse-of-discretion standard of review, concluding that a drunk-driving death was an "accident" under LINA's identical AD&D policy. *McClelland v. Life Ins. Co. of N. Am.*, 679 F.3d 755, 760–61 (8th Cir. 2012). Importantly, the insureds in these cases were as reckless, if not more reckless, than Scott was here.

In *Johnson*, the insured was driving at 1:30 a.m. with a BAC of 0.289% when he lost control of his vehicle and veered off the road, struck a highway sign, and flipped over multiple times. The Fourth Circuit applied the "substantially certain" test in the absence of any policy definition of the word "accident." 716 F.3d at 826. In the record was "only general statistical data regarding the extent to which a driver's ability to operate a vehicle is impaired by alcohol." *Id*. Although that data "support[ed] the conclusion that injury or death is a reasonably foreseeable consequence of

driving at significant levels of intoxication," the court held that the data did not "demonstrate[] that driving with a BAC of .289[%] under these circumstances [was] *substantially certain* to result in death or severe injury." *Id*. (emphasis in original).

In *LaAsmar*, the insured had a BAC of 0.227% when he was driving in the early morning hours on a two-lane country road at a speed of 60 miles per hour in a 40-miles-per-hour zone. He was not wearing his seat belt when he was ejected from the car as it left the road and rolled four and one-quarter times. The policy at issue did not define the word "accident," and the Tenth Circuit refused to supply one. 605 F.3d at 809–13. Instead, the court asked only whether a reasonable person would believe that the insured's death in these circumstances was the result of an "accident." *Id*. at 806–08.

The *LaAsmar* court answered in the affirmative because a reasonable person "would call the resulting rollover an 'accident' . . . whether [the insured] wrecked his truck because he fell asleep or lost control because he was speeding." *Id*. at 808. "It should also be true," the court concluded, "if he ran off the road because he had a BAC of .227[%]." *Id*. Although the court made clear that it was "not suggesting that there are no circumstances where an insured would be so drunk that a resulting wreck could no longer be deemed an accident," it held that the facts of the case did not clear that bar. *Id*.

Finally, in *McClelland*, the insured had a BAC of 0.203% when he was riding his motorcycle and "playing 'follow the leader' with another motorcycle and possibly [another] vehicle by weaving in and out of traffic for approximately six miles." 679 F.3d at 758, 761. He was not wearing a helmet and was estimated to be traveling at

90 miles per hour when he missed a curve, slipped onto a gravel shoulder, and flipped several times. *Id*. at 758. His LINA insurance policy defined the word "accident" exactly as the policy does here.

The Eighth Circuit in *McClelland* applied the *Wickman* test in determining whether an accident had occurred. *Id*. at 759–61. It reasoned that LINA had overlooked evidence indicating the insured's subjective belief that death was not highly likely. *Id*. at 760–61. This belief was objectively reasonable, the court held, because although he was driving very fast with an elevated BAC, he "had been successfully performing this feat for a distance of several miles." *Id*. at 761. The court therefore determined that LINA had abused its discretion in concluding that this was not an "accident" under the policy. *Id*. at 761–62.

When considered in light of *Johnson*, *LaAsmar*, and *McClelland*, the record before us does not support the conclusion that death was substantially certain to result from Scott's conduct. His actions were quite comparable to those of the insureds in the cases just cited. Scott's BAC was slightly less than that of the insured in *McClelland*, and the insured there drove much faster. Similarly, although Scott was speeding more than the insureds in *Johnson* and *LaAsmar* (in relation to the applicable speed limits), he was significantly less intoxicated than the insureds in those cases.

The record also provides little to no information that would allow us to assess the actual likelihood of Scott's death from his actions. *Johnson* is particularly persuasive on this point. As here, the record in that case consisted chiefly of information supporting the "widely-accepted common-sense proposition that blood alcohol concentration is directly correlated with the degree of impairment an individual

displays when driving after drinking." *Johnson*, 716 F.3d at 826 (internal quotation marks omitted).

The only information in the record here touching on the likelihood of Scott dying is found in the statements from Dr. Siek.  He stated that "[t]he probability of accidents increases exponentially as the [BAC] goes above 0.08[%]" and that "[b]oth the driving accident and the inability to save himself from drowning were impacted by his state of intoxication."   The doctor's opinion, however, reflects nothing more than the common knowledge that the probability of accidents increases as one gets more intoxicated.  And, as the Tenth Circuit has pointed out, "[t]he fact that driving drunk may increase the chances of being killed in an accident does not necessarily make that accident expected." *LaAsmar*, 605 F.3d at 811–12 (citation omitted).

In addition, Dr. Siek opined as to the specific "physical and mental impairments" that would result from a BAC at Scott's level.  Once more, though, evidence that "makes clear that impairment is highly likely" for someone with Scott's BAC does not help answer whether that impairment is substantially certain to result in death.  *See Johnson*, 716 F.3d at 826.

None of this information sheds light on how likely Scott's death was because the record is devoid of any "data with respect to drunk driving fatalities [or serious injuries] in relation to the incidents of drunk driving generally." *See id.*; *see also West v. Aetna Life Ins. Co.*, 171 F. Supp. 2d 856, 903 (N.D. Iowa 2001) (holding, in a case where the insured fatally crashed with a BAC of 0.20%, that an insurer unreasonably withheld benefits because it "identifie[d] no evidence establishing any link between some degree of impairment, or even increasing degrees of impairment, and

increasing *probability* of death or injury." (emphasis in original) (internal quotation marks omitted)).

There is no doubt that "drunk driving is ill-advised, dangerous, and easily avoidable." *Kovach v. Zurich Am. Ins. Co.*, 587 F.3d 323, 330 (6th Cir. 2009). But many accidents, if not most, involve an element of negligence or even recklessness on the part of the insured. People all too frequently fail to heed stop signs, drive while intoxicated, or exceed the speed limit. Death caused by such conduct is, however, a statistical rarity, and the record before us does not show that Scott's particular act of drunk driving was substantially certain to result in his death. The district court therefore correctly determined that Scott's death was an "accident" and thus covered under his father's insurance policy.

## III.  CONCLUSION

"The solution for insurance companies like [LINA] is simple: add an express exclusion in policies covering accidental injuries for driving while under the influence of alcohol, or for any other risky activity that the company wishes to exclude." *Kovach*, 587 F.3d at 338. This would allow policyholders "to form reasonable expectations about what type of coverage they are purchasing without having to make sense of conflicting bodies of caselaw that deal with obscure issues of contractual interpretation." *Id*.

LINA did not do so here, which leaves us to decide how to construe the word "accident," an inherently difficult concept to fully capture. And because LINA waited until this appeal to first argue that *Padfield*'s definition of the word "accident" should not apply, it forfeited that argument. The district court therefore correctly applied *Padfield* when it concluded that Scott's death was not "substantially

certain" to occur from his conduct, and was thus accidental. Accordingly, we **AFFIRM** the judgment of the district court.

---

IKUTA, Circuit Judge, concurring:

I write separately to emphasize that today's opinion applies the definition of "accident" set forth in *Padfield v. AIG Life Ins. Co.*, 290 F.3d 1121 (9th Cir. 2002), only because the Life Insurance Company of North America (LINA) relied on *Padfield* and forfeited its argument that the insurance policy's own definition of "accident" applies.

It has long been established that courts "faced with questions of insurance policy interpretation under ERISA" must "apply federal common law." *Id.* at 1125. And it is a bedrock common law rule that "courts should first look to explicit language of the agreement to determine, if possible, the clear intent of the parties." *Gilliam v. Nevada Power Co.*, 488 F.3d 1189, 1194 (9th Cir. 2007) (cleaned up). This is because "ERISA's primary purpose is to ensure the integrity of written, bargained-for benefit plans," *Zurich Am. Ins. Co. v. O'Hara*, 604 F.3d 1232, 1236 (11th Cir. 2010), and "applying federal common law doctrines to alter ERISA plans is inappropriate where the terms of an ERISA plan are clear and unambiguous," *id.* at 1237 n.4.

Thus, if a policy defines the term "accident," we must apply that definition. *See Gilliam*, 488 F.3d at 1194. Indeed, we have only applied the *Padfield* definition in cases where the relevant policy did not define the term "accident." *See Padfield*, 290 F.3d at 1124; *Williams v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*, 792 F.3d 1136, 1138 (9th Cir. 2015). And, in cases where the relevant term is defined by the

policy, we apply only that definition.  *See Gilliam*, 488 F.3d at 1195 ("Our task therefore is to determine whether . . . the plan's definition of 'earnings' . . . includes [the plaintiff's] severance pay.").

Here, as the court's opinion notes, Wolf's insurance policy expressly defines the term "accident" as "[a] sudden, unforeseeable, external event that results, directly and independently of all other causes."  In the ordinary case, then, our inquiry would be whether the death of Wolf's son was "sudden" and "unforeseeable."  *See Gilliam*, 488 F.3d at 1194–95.  However, LINA forfeited its argument that the policy's definition of "accident" applies by failing to present that argument when it denied Wolf's claim and at the district court.  Because LINA forfeited that argument, we forego the general rule that the express language in the policy applies, *see Gilliam*, 488 F.3d at 1194–95, and rely on the definition in *Padfield* instead.

Indeed, applying the *Padfield* framework in this case for any other reason would be contrary to our precedent.  *See id.*  Because the court's opinion is consistent with that precedent, I concur.